### C. M. MACDONNELL ET AL. V. JULIANA DE LOS FUENTES ET AL.

#### No. 237.

1. **Impressions of Witness Properly Excluded.**—The answers of a witness, that he was under the impression that there was a sale of certain land, and that one of appellees told him she had sold the land, were properly excluded. Such impressions were vague and uncertain, and as such are not evidence.

2. **Continuance Refused.**— The answers of the witness having been properly stricken out, the refusal of the continuance was proper, if the object was to obtain a repetition of the answers; and if to obtain different answers from the witness, the application failed to show diligence in procuring them; the depositions had been on file for years.

3. **Pleadings in Another Suit Properly Excluded.**—It was not error to exclude the petition and answer in the cause of Alpheus Rackliff v. The State of Texas. The only purpose for offering the petition would be to show that Rackliff claimed the land, which fact was shown by the decree entered in the case, and it could have served only to mislead and confuse the jury; and being sworn to by Rackliff, the jury might have considered it as evidence of the facts therein alleged.

4. **Receipt Can Be Attacked Without First Making Affidavit of Forgery or Pleading Non Est Factum.**—The receipt of Agapito Martinez could be attacked without making affidavit of forgery, or pleading non est factum; it was acknowledged and recorded, and offered in evidence under article 2257 of the Revised Statutes. Its being over thirty years old, and having come from the proper custody, was sufficient proof of its execution to admit it in evidence, but its execution was only presumed; and when a fact to be presumed is controverted by direct testimony, the jury may indulge or reject the presumption, as the entire evidence may justify.

5. **Charges Asked and Given.**—When no general charge is given, and the case is submitted on general charges asked by both parties, if there was error in the charge given for appellees that was cured by charges asked and given for appellant, he should not be heard to complain on that score.

6. **Charge—Forged Deed in Chain of Title.**—A charge, that if the evidence shows a forged instrument in the chain of defendant's title, it is such a defect as shows the want of intrinsic fairness and honesty, and will defeat the plea of limitation of three years, is correct.

7. **Charge—Laches.**—That laches, or neglect of plaintiffs, in bringing suit and in paying taxes would not defeat their action, when there has not been adverse possession for sufficient length of time to support the statute of limitations, is a correct charge.

8. **Charge—Power of Attorney.**—See opinion for correct charge on the title held by appellees, and the necessity of appellants, under their plea of not guilty, connect-

ing themselves with the original grantee, and on the effect of a conveyance, under a power of attorney.

**9. Adverse Possession.**—See opinion for facts held insufficient to show appellants had acquired title to the land under the five years statute of limitations.

APPEAL from La Salle.    Tried below before Hon. R. W. HUDSON.

*E. A. Atlee* and *Nicholson, Dodd & Mulally*, for appellants.—1. On refusing appellants' application for continuance: Rev. Stats., art. 1278; Pruitt v. Everett, 10 Texas, 283; Griggsby v. May, 57 Texas, 258; Chitson v. Reeves, 29 Texas, 279; Cleveland v. Cole, 65 Texas, 404; Hipp v. Bissell, 3 Texas, 20; Doll v. Mundine, 84 Texas, 315; City of Corsicana v. Kerr, 75 Texas, 208; Railway v. Henning, 52 Texas, 474; Price v. Lauve, 49 Texas, 81.

2. On excluding petition and answer in case of Rackliff v. State of Texas: Neil v. Keese, 5 Texas, 31; Glasscock v. Hughes, 55 Texas, 470; Hickman v. Gillum, 66 Texas, 315.

3. On attacking receipt without affidavit of forgery or plea of non est factum: Rev. Stats., art. 2262; Id., art. 1265, sec. 8; Waterworks v. White, 61 Texas, 538; Yeary v. Cummins, 28 Texas, 94.

4. On erroneous charges: Rev. Stats., art. 1317; Dwyer v. Ins. Co., 57 Texas, 183; Cannon v. Cannon, 66 Texas, 686; Railway v. Faber, 63 Texas, 345; Railway v. Gilmore, 62 Texas, 392; Belcher v. Fox, 60 Texas, 531; League ·v. Rogan, 59 Texas, 434; Holmes v. Coryell, 58 Texas, 689; Johnson v. Timmons, 50 Texas, 533.

5. On possession to support limitations: Richards v. Smith, 67 Texas, 610; Ivey v. Patty, 70 Texas, 178.

*W. Showalter*, for appellees.—1. On continuance and excluding evidence: Burnett v. Friedenhaus, 21 S. W. Rep., 545; Davie v. Terrell, 63 Texas, 107; Hammond v. Hough, 52 Texas, 63; Grimes v. Watkins, 59 Texas, 138; Allyn v. Willis, 65 Texas, 70; Railway v. Hardin, 62 Texas, 367; Withee v. Fearing, 23 Texas, 503; Mooring v. McBride, 62 Texas, 311; De Garca v. Galvan, 55 Texas, 53; Houston v. Blythe, 60 Texas, 511.

2. On charges: Murphy v. Welder, 58 Texas, 235; Mast v. Tibbles, 60 Texas, 301; Satterwhite v. Rosser, 61 Texas, 166; Moss v. Berry, 53 Texas, 632.

3. On limitations: Fuentes v. Macdonnell, 85 Texas, 132; Sayles' Civ. Stats., arts. 3191, 3192.

4. On failure to record Callaghan will: Rev. Stats., art. 4876; Cook v. Dennis, 61 Texas, 248; Porter v. Chronister, 58 Texas, 56; Medlin v. Wilkins, 60 Texas, 418.

5. That deeds should be recorded in proper county: Rev. Stats., art. 4333; Alford v. Johnson, 71 Texas, 521; Adams v. Hayden, 60 Texas, 226; Hart. Dig., art 3262.

NEILL, ASSOCIATE JUSTICE.—This suit was instituted by the appellees in the form of an action of trespass to try title to recover from C. M. Macdonnell four leagues of land, known as the "San Casimero" tract, lying in the counties of Encinal and La Salle.

The appellants, defendants below, pleaded a general denial, not guilty, and the three, five, and ten years' statutes of limitation. The appellees, plaintiffs below, at the same time filed a supplemental petition alleging coverture of some of plaintiffs in avoidance of the statute of limitation.

On October 20, 1892, the death of the original defendant was suggested, and Allen Macdonnell and Mary Macdonnell, the appellants, were made parties defendant, who, on the 14th of November, 1892, adopted the answer of the original defendant.

The case was tried before a jury and resulted in a judgment for plaintiffs, from which this appeal was taken. This case was on appeal before to our Supreme Court, and is reported in 85 Texas, 132.

*Conclusions of Facts.*—1. Valentin de los Fuentes died intestate in 1833, vested with an inchoate title to the lands involved in this suit. He left surviving him his wife, Tomasa de la Pena, and six children, whose names are Juliana, Josefa, Refugio, Sabas, San Juana, and Barbora. After his death a natural daughter, who was named Concepcion de Pena, was born unto his wife. Juliana married Juan Flores in 1835, who died in 1855; Josefa married Agapito Martinez in 1840; Refugio married Julian Gonzales in 1852, who died two years after his marriage; San Juana married Guadalupe Vidaurri in 1842, who died prior to his wife, who died in 1865, leaving three sons, Ildefonso, Lucio, and Serapio, who are plaintiffs. Sabas de los Fuentes, a son, died in 1879, leaving a son, Valentin, Jr., who in turn died leaving a son named Jose Refugio; Barbora married Manuel Maria Moveno, both of whom are dead, and a son named Manuel Maria, Jr., survives them and is one of plaintiffs. Concepcion never married. Tomasa de la Pena died in the year 1868.

2. On the 17th day of April, 1871, the State of Texas issued a patent granting the land in controversy to Valentin de los Fuentes, his heirs or assigns.

3. Evidence upon which the third conclusion of fact is based: The appellants claim title to the land in controversy through the wife and heirs of Valentin de los Fuentes, the original grantee. In determining whether this claim is sustained by the record we deem it best, before stating our conclusion on this issue, to recite at some length the testimony upon which we base such conclusion. C. M. Macdonnell, the original plaintiff, testified by depositions, that D. W. Heard was the name Charles Callaghan used in a correspondence he had with Augustine M. Saavedra in regard to the San Casimero tract of land.

No facts, however, are stated by the witness upon which he bases such conclusion; nor is there anything found in the record to indicate that Callaghan ever used such name. There is a letter, the contents of which will be stated, copied in the record, which purports to have been written by Saavedra and addressed to D. W. Heard, but there is nothing to indicate that it was written to Charles Callaghan. He also deposed, that Alpheus Rackliff died about the time the patent for the land was issued, and that he was known among the Mexicans as Don Rafael Alfrido. He attached to his depositions Exhibits "A," "B," and "C," which are respectively as follows:

[EXHIBIT "A."]

*"Senor Don Rafael Alfrido:*          "C. GUERRERO, 29th August, 1855.

"I take occasion to salute you, and advise you that I have learned that you sold the land which belongs to me and my Sabas. We are very much in need of money, which we owe in Roma. See if you can send us as much as 150 dollars to cover, and from the same pay the expenses which belong to it. Nothing further, etc.

[Signed]     "MA. TOMASA DE LA PENA."

[EXHIBIT "B."]

"I have delivered to Don Agapito Martinez, of the City of Guerrero, six hundred and thirty-three dollars and three bits and a half, in full payment for the land of San Casimero which belonged to Don Valentin de los Fuentes, as agent of the heirs of Valentin de los Fuentes, deceased.            [Signed]     "AGAPITO MARTINEZ."

"Laredo, Texas, August 12, 1861.

[EXHIBIT "C."]

*"Senor Don D. W. Heard:*          "NEW LAREDO, March 26, 1871.

"MY VERY DEAR SIR—Having been advised by Rafael Alfrido that being about to sell to you the pasture land known as the water hole of San Casimero, which by denouncement belonged to the family of my deceased wife, Dona San Juana Fuentes, you have a fear that hereafter a claim may arise on the part of some heir, and for this reason I should give him a certificate of the legal acquisition of the said right. In accordance with what is just, I ought to say to you that in the year 1861, when I came from Mexico, I was informed by the lady my mother-in-law, Dona Tomasa de la Pena, that with previous consent of her children, all of whom were present except my deceased wife and my sister-in-law, Barbora Fuentes, who lived in Guanajuato, she had sold to Don Alfrido the pasture land of San Casimero, which belonged

by denouncement to my deceased father-in-law, Don Valentin de los Fuentes, and to effect this one thousand dollars had been received in satisfaction, which was paid in goods and advances on accounts.

"As the said Alfrido desired to legalize his purchase, a few days after my arrival from the capital he caused her to execute a document which should verify it, and to this effect it was subscribed by all the children present, I doing it myself likewise for the part of my wife, although I was not satisfied with said sale.

"Therefore in my judgment Don Rafael Alfrido is the actual possessor and lawful owner of the said land, and has the right and power to do with it what he pleases. This is all the information I can give you now, having taken pleasure in offering you my services.

[Signed]      "AGN. M. SAAVEDRA."

Macdonnell testified, that the first two papers were delivered by Rackliff to Callaghan at the time the latter bought the land, and that he has had all of the papers in his possession ever since Callaghan's death. The appellants also, after proving they came from the proper custody, introduced in evidence as ancient instruments the following papers, against which appellee had filed affidavits of forgery, viz:

"Know all men by these presents, that I, Tomasa Fuentes, widow of Valentin de los Fuentes, deceased, and administratrix of the estate of said Valentin de los Fuentes, and my son, Sabas Fuentes, together with me, did for a valuable consideration, on the 25th day of October, 1838, partially relinquish unto Alpheus Rackliff all the right, title, and interest in and to a certain tract or parcel of land lying and being situated in the State of Texas, and known as the San Casimero tract of land, lying on a creek or arroya called San Casimero, or El Salado, some twelve or fifteen miles from the Nueces river.

"Witnesses:                         "AGAPITO MARTINEZ.
"YGNACIO GUERRA,
"MARCOS MARTINEZ."

Then follows what purports to be an affidavit of the subscribing witness Marcos Martinez, made before C. C. Pierce, a notary public of Webb County, on the 6th of February, 1888, that he (Martinez) "saw Agapito Martinez, the person who executed the foregoing instrument, subscribe the same, and that he had signed the same as a witness at the request of the said Agapito Martinez."

"Know all men by these presents, that I, Agapito Martinez, by virtue of a power of attorney given me by mother-in-law Tomasa Pena de los Fuentes, widow of Valentin de los Fuentes, deceased, for and in consideration of the sum of one thousand dollars to me in hand paid by Alpheus Rackliff, the receipt of whereof is hereby acknowledged,

do now give, grant, sell, and convey unto the said Alpheus Rackliff, all and entire that certain tract or parcel of land lying and being in the State of Texas, and known as the San Casimero tract of land, situated on a creek or an arroya called El Salado, distance from the Nueces river twelve or fifteen miles. To have and to hold the same to the said Alpheus Rackliff, his heirs and assigns, to his and their use forever; and I, the said Agapito Martinez, covenant with the said Rackliff, his heirs and assigns, that I have full right and power to sell and convey the said premises; that the said premises are clear and free from all incumbrances, and that I will at any time hereafter make all such further assurances for the more effectual conveying of the said premises as may be reasonably required; and I, the said Martinez, will warrant and defend the said premises unto the said Rackliff, his heirs and assigns forever.

"In witness whereof I have hereunto set my hand and seal, this 12th day of August, 1861.

"AGAPITO MARTINEZ,
"TOMASA DE LA PENA,
"SABAS FUENTES,
"In presence of:  "SAN JUANA DE LOS FUENTES,
  "YGNACIO GUERRA,  "JOSEFA M. FUENTES,
  "MARCOS MARTINEZ."  "REFUGIO FUENTES.

"STATE OF TEXAS, }
 "County of Webb. }

"Personally appeared before T. K. Anderson, county clerk of Webb County, Agapito Martinez, after being duly sworn acknowledged his signature, and that he signed the within document for the therein set forth.  "T. K. ANDERSON, C. C. W. C."

The certificate of the county clerk of Webb County attached to the instrument shows that it was filed in his office on the 8th day of February, 1888, and recorded same day in record of Encinal County.

Serapio Vidaurri, a witness for defendants, testified, that he was a son of San Juana de los Fuentes, and knew Tomasa Pena de los Fuentes; that in 1861 he lived in Guerrero, and knew Agapito Martinez and Dr. Rackliff; that he heard of land transactions between Dona Tomasa; that he heard his aunts Josefa, Refugio, and Concepcion speak of it. They said they had sold the San Casimero lands to Don Rafael Alfrido; that he did not know the amount they got for it; they got part money and part goods; he did not see the money, but saw part of the goods; that he remembered seeing one organdie dress; that at the time, his grandmother and her three daughters, Refugio, Concepcion, and Josefa, all lived together in the house of his grandmother; that his aunt, said Dona Tomasa, made the sale; that at the time, his uncle Sabas was living in Texas, and his stepfather, Augustine M.

Saavedra, was living with witness' grandmother; that he never heard of any claim being made to the land by his aunts until this suit was instituted. The witness was then shown the deed dated August 12, 1861, and said: "I see the name of San Juana, who was my mother, to the instrument. It is not her signature, because she could not write."

Marcos Martinez, a witness for defendants, testified, that he was 70 years old, and had lived in Laredo since his birth; that he knew Dr. Rackliff well, and that he introduced him to Agapito Martinez in 1861. The witness was shown the deed dated August 12, 1861, and said that he saw his name and that of Agapito Martinez on the document in two places; that witness signed his name in both places with his own hand, and that he saw Agapito and Sabas sign their names to the deed, and that he signed his as a witness at the request of Dr. Rackliff, Agapito, and Sabas; that he did not sign as a witness for the other names. On cross-examination he said, that he was present at the former trial of the case for the purpose of proving his signature, but did not testify, because he was not called as a witness, and that he did not go before C. C. Pierce and swear that he saw Dona Tomasa, San Juana, Refugio, and Josefa sign said deed, and that he never went before C. C. Pierce for any such purpose. It is admitted in the statement of facts that Marcos Martinez is the person who signed as a witness and went before C. C. Pierce to authenticate the deed, July 6, 1888.

Josefa, Juliana, and Refugio testified, that Juliana knew how to write her name; that Josefa and Refugio did not know how to write, and made their marks for their signatures; that they never gave Agapito Martinez nor any one else any power of attorney or authority to sell the land, and that on the 12th of August, 1861, Tomasa de la Pena, Juliana, and San Juana were in Guerrero, Mexico.

Erasmo Martinez testified, that Agapito Martinez was his father; that witness was present at the former trial of this cause, and heard his father, who is now dead, testify as a witness in the case; that he knew his father's signature from having often seen him write, that the signature to the instrument of August 12, 1861, is not his father's. That Agapito Martinez swore on the former trial of the case that he had no right to sell the San Casimero.

W. Showalter also testified: "I was here at the former trial of this cause and heard Agapito Martinez testify. Mr. McLane, then an attorney for defendants, had offered in evidence a receipt purporting to be signed by Agapito Martinez, to which I objected, and then Agapito was placed on the stand to prove it up. He then stated, that it was not his signature, because it did not have his 'firma.' I then showed him the deed dated August 12, 1861, and he said it was not his signature. He was then asked if he had any power of attorney from Tomasa de la Pena and others, to which he answered, 'No; because I would

have to have a power in writing, signed by all the family.' He further testified, that he examined the record about the time this suit was instituted and Agapito's name was there, but none of the others, and that Marcos Martinez was present and testified at the former trial of the case that all the persons whose names appear to the deed were present when he signed it."

Erasmo Martinez also testified, that he heard Marcos Martinez testify at the former trial that Agapito, Sabas, San Juana, Refugio, and Josefa came to Laredo and signed the instrument dated August 12, 1861, in his presence.

From this testimony, taken in connection with all the other evidence, we find, as our third conclusion of fact, that the wife and heirs of Valentin de los Fuentes, nor any of them, ever executed a deed of conveyance, or contract in writing, to convey the land in controversy, nor did they or any of them ever authorize or empower any one in writing to sell said land, and that the instrument of August 12, 1861, is a forgery, and not the act and deed of the wife and heirs of original grantee, nor of any of them, and that it was not made by their authority, and has never been ratified by any of them.

4. On the 13th of July, 1855, Alpheus Rackcliff executed to E. J. Davis a deed of that date conveying an undivided one-fourth interest in the land in controversy, which was duly acknowledged and filed for record in the office of the county clerk of Webb County on November 30, 1855. On the same day the deed was executed, E. J. Davis entered into a written agreement with Rackliff to give his services and attention as an attorney at law to the perfecting of the title to the San Casimero land in so much as might be necessary to the securing of a patent from the State of Texas; to pay half of the surveyor's fees for surveying the tract after confirmation of title, and to pay half the fees to be paid the Commissioner for investigating land titles in Webb County, in the event the title to the land should be confirmed by the Legislature, which agreement was filed for record in Webb County in December, 1855.

5. On the 12th day of January, 1861, in a suit styled Alpheus Rackliff v. The State of Texas, it was decreed by the District Court of Webb County, that the claim of Valentin de los Fuentes to the land in controversy was "confirmed unto the said Valentin de los Fuentes, and to his heirs and assigns, and to every one of them." And in which the plaintiff in the suit, Alpheus Rackliff (he being the only plaintiff), was condemned to pay the Commissioner of the General Land Office of Texas, for the use thereof, the sum of $40, all costs of suit, and the fees and charges provided by law, which decree was filed in the General Land Office in 1861, and the $40, costs of suit, fees, and charges, were all paid by Rackliff, and the patent to the lands was procured from the General Land Office by him.

6. On May 17, 1871, Alpheus Rackliff conveyed to Charles Callaghan by his deed of that date, three-fourths interest in the San Casimero four-league tract, which was filed for record on the same day and recorded the 18th day of May, 1871, in the records of deeds of Webb County.

7. On the 2nd day of February, 1872, Trinidad Trevindi Rackliff, describing herself as the wife of Alpheus Rackliff, conveyed all of her right, title, and interest in three-fourths of the San Casimero lands to Charles Callaghan, by her deed of that date, which was filed for record on the day of its date, and recorded May 6, 1872, in the records of deeds of Webb County.

8. On the 5th day of December, 1871, E. J. Davis made a deed of that date to Charles Callaghan, conveying an undivided fourth interest in the San Casimero tract, which was filed for record May 6, 1872, in the records of deeds of Webb County.

9. On March 11, 1872, Charles Callaghan made his last will and testament, devising the San Casimero tract, together with other property, to C. M. Macdonnell. Callaghan died on the 20th day of December, 1874, and his said will was, on application made to the district clerk of Webb County, there being no contest, probated by said clerk in vacation on the 1st day of January, 1875. This will or the order probating was never filed for record nor recorded in the office of the county clerk of Webb County, nor in either of the counties in which the land in controversy is situated, there being no record of it save in the minutes of the Probate Court.

10. Tax receipts were introduced showing payment of taxes on the land in controversy as follows:

| Year | County | To Whom Paid | No. of Acres |
|---|---|---|---|
| 1874 to 1876 | Encinal | Comptroller | 11,808 |
| 1874 to 1876 | La Salle | Comptroller | 5,904 |
| 1881 | Encinal | Collector Webb County | 17,713 |
| 1881 | La Salle | Collector La Salle County | 5,638 |
| 1882 | La Salle | Collector La Salle County | 5,904 |
| 1883 | La Salle | Collector La Salle County | 2,530 |
| 1883 | Encinal | Collector Webb County | 15,181 |
| 1884 | La Salle | Collector La Salle County | 2,530 |
| 1885 | La Salle | Collector La Salle County | 531 |
| 1886 | Encinal | Collector Webb County | 17,181 |
| 1886 | La Salle | Collector La Salle County | 531 |

C. M. Macdonnell, in his deposition, stated: "I know that I and Callaghan have paid all the taxes on this land since 1871 or 1872."

11. From the year 1874 to 1879 or 1880, and from December, 1881, up to the time this suit was instituted, which was the 27th of May,

1887, the San Casimero was used by Callaghan, and after his death by Macdonnell, for grazing sheep and goats thereupon. There were from four to eleven flocks upon the land during the time, from 1500 to 2000 each. Each flock was kept in charge of a shepherd, who was supplied from the supply camp on the tract. The land was not fenced during any of the time, nor were there any houses on it. But there were pens on it for penning the sheep and for lambing purposes. The pen is about thirty or forty feet square, constructed of mesquite posts from four to six inches in diameter, set about eighteen inches in the ground, and extending about five feet above. They are set in pairs about a foot apart, and the pairs are about three feet from each other. The space between the posts is filled with brush pressed down until it reaches the top of the posts, and thus the pen or inclosure is formed. This pen has been on the land since 1878, and there were pens like it before that time. The pens for lambing were built of brush only, and had to be repaired or rebuilt every year. The labor in constructing the pen would cost about $10. The boundaries of the land, with the exception of about two miles on the east and one mile on the north, were marked. The land was fit for grazing purposes only. The only witness who testified to this character of possession says, that he had been the manager of the ranch continuously since 1874, with the exception of one year, in 1879 or 1880, when he was away. That he returned in December, 1881, and found sheep on the land. But it does not appear that the land was occupied for any purpose during the time he was absent, unless by inference. And we do not feel authorized in inferring a fact, from the evidence in this case, which could and should, if it existed, have been proven by direct testimony.

12. The defendants are the sole heirs of C. M. Macdonnell.

*Conclusions of Law.*—Appellants' first assignment of error complains of the court's suppressing certain interrogatories to and answers of Augustin M. Saavedra, which are, together with the objections to them, as follows:

Interrogatory 3. "Do you know anything about a tract of land in La Salle County known as the San Casimero, said to have been claimed by Valentin de los Fuentes? If so, do you know whether or not a sale of this land was ever made by Tomasa de la Pena and the heirs of Valentin de los Fuentes? Please state all you know about it."

Answer of Saavedra to third interrogatory: "I know of the tract of land known as the San Casimero tract, owned by Valentin de los Fuentes. I do not know positively that there was a sale of the said land. I am under the impression that there was a sale made."

The fourth interrogatory to Saavedra was as follows:

Interrogatory 4. "If you say that such sale was made, then state about what year it was made, and who bought the land. How much, if

anything, was paid for it? Who received the purchase money? Have the heirs of Valentin de los Fuentes, or any of them, ever said anything to you about the sale of this land? If so, what was said, and which of them said it?"

Answer: "I think the sale was made in the year 1861, to Rafael Alfrido. I never saw the conveyance that I remember. I do not know where it is now. I am under the impression that Tomasa de la Pena told me that she had sold this tract of land."

Appellees make objection in writing to these questions and answers, as follows:

To the third interrogatory and answer thereto:

First. Because said interrogatory was leading.

Second. Because a sale of land can not be proved by parol testimony; the best evidence is the deed.

Third. Because the answer thereto is not such positive testimony as to amount to proof, and shows that the witness does not know of any such sale; and amounts only to a guess or impression of the witness, not admissible in evidence; and because a sale of real estate in Texas or conveyance thereof can not be shown by parol testimony of this class.

To the fourth interrogatory and answer:

First. Because a sale of real estate can not be proved by parol testimony, and because the best evidence would be the deed.

Second. Because the answers to said question show that the witness has no knowledge of the matter inquired of, and is merely hearsay and impressions, and not positive knowledge.

These exceptions were sustained by the court, and the two questions and their answers were ruled out.

There was no error in the court's sustaining the objections to and excluding the answers of the witnesses. It is not shown by the answer of the witness, or anywhere in his depositions, upon what he based his "impression that there was a sale made." It was a mere impression, vague and uncertain, and as such was not evidence of a sale of the land. Whart. on Ev., secs. 514, 515. No fact is given by the witness to show upon what he based his opinion that a sale was made of the land. He had no recollection of ever having seen a conveyance, and was merely under the impression that Tomasa de la Pena told him that she had sold the land. Certainly such impressions, in the absence of proof of any fact upon which they could be based, would be no proof of a conveyance that could only be made in writing and proved by showing that such writing had been made. If there was a sale either by appellees, their ancestors, or any of them, written evidence of it, if attainable, should have been produced; and if it could not be obtained, proof should have been made of its execution, loss, and contents. It is true that such proofs may be made by circum-

stances, but impressions without foundation, such as testified to by the witnesses, can not be taken as a circumstance in proof of the ultimate fact, the execution and delivery of a conveyance in writing.   The answers were of such a nature that they could not possibly throw any light upon the question at issue, and no injury could have resulted to appellees from their exclusion.

If it was not error to exclude the answers of the witness, it was not error to refuse appellees' application for a continuance because of their exclusion, if the purpose of the continuance was only to obtain a repetition of the answers to be used on another trial.   If the object of the continuance was to obtain different answers from the witness, and to prove by him, "that in 1861 he heard Tomasa de la Pena say in the presence of her daughters that she had sold the land with their consent to Rackliff," the application was defective in failing to show any diligence in procuring such testimony before.  The depositions of the witness had been on file for years and defendants knew their contents, and should have had them retaken if the witness had not testified to facts within his knowledge.  The application does not show upon what information it is believed such proof can be made, nor when or from whom such information was received.  The interrogatories to which the other answers were made were sufficient to elicit the evidence for which the continuance was sought, and that such testimony was not given in response to them is sufficient to show such proof can not be made by the witness, in the absence of a statement of the information and source upon which the belief of the party who made the affidavit for continuance predicated his belief.  It would have been futile to have continued the case for evidence that could not be procured.

It was not error in the court's refusing to allow the appellees to introduce in evidence the original petition and answer filed in the cause of Alpheus Rackliff v. The State of Texas.  The only purpose for which the petition could have been admitted would be to show that Rackliff claimed the land.   This was shown by the decree entered in the case, and fully by the evidence upon this trial.

A basis for such claim is what should have been shown, and could not be shown from said petition.   The admission of the petition in evidence could have served no other purpose than to mislead and confuse the jury.   As it was sworn to by Rackliff, if it had been introduced in evidence the jury might have considered it as evidence of the facts alleged therein, although it was not evidence of a single allegation in it.

It was not error in the court's permitting the plaintiffs to attack the receipt copied in our third conclusion of fact, purporting to be signed by Agapito Martinez, without first making an affidavit of forgery or pleading non est factum.  The receipt did not prove or tend to estab-

lish anything. It was only an acknowledgment of Agapito Martinez in writing that he had received from himself six hundred and thirty-three dollars, three bits and a half, etc., and there is no sense in it. But however cogent it might have been as a link in appellants' testimony, it could be attacked without a plea of non est factum or affidavit of forgery. No pleading was "founded" on it. It was not acknowledged and recorded and offered in evidence under article 2257 of our Revised Statutes. Its being thirty years old, and having come from the proper custody, was sufficient proof of its execution to admit it in evidence. But after it was admitted its credibility and weight were questions for the jury. Its execution was only presumed, and when a fact to be presumed is controverted by direct testimony, the jury may indulge or reject the presumption, as the entire evidence may justify. Stooksbury v. Swan, 85 Texas, 569.

In this case no general charge was given by the court, the case being submitted to the jury upon special charges asked by the respective parties. It is complained by appellants that the third subdivision of the charge asked by and given at the request of appellees is on the weight of evidence, misleading, and informed the jury that the evidence therein referred to should not be considered, and is inconsistent with other charges given. It is unnecessary to copy in this opinion the portion of the charge complained of. When it is taken and considered in connection with the entire charge which was given to the jury, we do not think it will be found obnoxious to the objections urged against it; and that any vice in it is completely cured by charges given at the appellants' request. Indeed, it would be hard to find a charge, when the whole of this is taken and construed together, in which the law is at all respected or regarded, more favorable to a party than the one given in this case is to the appellants. Counsel for appellants displayed extraordinary ingenuity, skill, and ability in the preparation of such charges as would present the case to the jury in the most favorable conceivable light for their clients; and we can only wonder at their success in having the court to give some of their special charges. It will be found that some of the propositions announced in them have no relation to the law applicable to this case, and are therefore necessarily in conflict with the law where it was properly charged. But such conflicts are favorable to the appellants, arose at their instance, they obtained all the advantages that could be drawn from them, and should not now be heard to complain on that score.

There was no error in the court's instructing the jury, "that Alpheus Rackliff acquired no rights in the land in controversy from the fact that he was plaintiff in the case of Alpheus Rackliff v. The State of Texas, wherein the decree of confirmation was entered in the District Court of Webb County, Texas, unless you believe he had title

otherwise." The charge was proper and necessary after admitting in evidence the decree referred to. This decree confirms the title in Valentin de los Fuentes, his heirs and assigns. If admissible in evidence at all, it was only as a circumstance to be considered in connection with other testimony to show appellants had acquired title to the land.

The appellants' fourth special charge instructed the jury that the decree could be taken as a circumstance from which they might presume a title. This was more frvorable to the appellants than they were entitled to. It at least gave appellants every advantage that they could possibly claim from said decree.

The court also instructed the jury at appellees' request as follows: "But if you find that any one of the plaintiffs, or that some of the plaintiffs, are entitled to recover and some not, then you must find in your verdict which of the plaintiffs, or which plaintiff, is entitled to recover, and also how much each of said plaintiffs is entitled to recover, and to aid you in such event in arriving at a verdict, you are charged that the patent vested the title to the land in the heirs of Valentin de los Fuentes and his surviving wife, if he had died and left a wife and heirs, provided his wife and heirs had not disposed of the land previous to the issuance of the patent." This is clearly the law. It was applicable to the facts, and was properly given in the charge.

The court at the instance of appellees instructed the jury: "If you believe from the evidence that in the chain of transfer of defendants' title or color of title from the sovereignty of the soil to themselves there be a forged deed, then you are charged that said forged deed is such a defect as extends to and includes the want of intrinsic fairness and honesty, and you must find against the defendants on said plea of limitation of three years." It is urged that this charge is erroneous, because "there was other evidence, both written and oral, besides the deed referred to in the charge complained of, for the consideration of the jury, upon which it might, under instruction, have found for defendants under their plea of three years' statute of limitations, and that it was error for the court to make defendants' right to recover on their plea of three years' statute depend solely upon the genuineness of said deed." We fail to see how the appellants could avail themselves of the statute of three years' limitation if there was a forged deed in the chain of transfers constituting their title or color of title from the sovereignty of the soil to themselves. No deed was specially referred to in the charge. If any link in the chain connecting appellants with the sovereignty of the soil was forged, they would neither have title nor color of title.

Nor do we think there was any error in the court's charging the jury, that laches or delay or neglect of plaintiffs in bringing suit and in paying taxes would not defeat their action when there has not been actual adverse possession for sufficient time to support the statute of limita-

tion. The question of adverse possession was fully submitted to the jury in appropriate charges, or at least favorable to the defendants in submitting their pleas of limitations. And the charge here complained of must be construed in connection with such charges on limitations.

The tenth assignment of error, which complains of the fifth and sixth instruction given by the court at the instance of appellees, is not well taken. The patent had the effect, as stated in the charge, to vest the title in the widow and heirs of Valentin de los Fuentes, "and they did not lose their right in the land or title thereto except in some manner recognized by law or equity, unless they had previously sold the land," and for defendants to maintain their defense under their plea of not guilty, it was incumbent upon them to show a chain of title connecting them link by link with the original grantee, his widow or their heirs, or that they acquired in some manner recognized by law or equity. The charges complained of are certainly not obnoxious to the objections urged in the assignments.

The eleventh assignment of error complains of the following charge: "If you believe from the evidence that the instrument of writing purporting to be a conveyance from Agapito Martinez to Alpheus Rackliff, dated August 12, 1861, and recorded 8th day of ·February, 1888, and proved for registration February 6, 1888, by a subscribing witness, Marcos Martinez, and purporting to convey the lands in controversy to Alpheus Rackliff, by virtue of a power of attorney from his mother-in-law, Tomasa de la Pena, was in fact executed and delivered by Agapito Martinez to Alpheus Rackliff, and that Agapito Martinez had a power of attorney from said Tomasa de la Pena to execute said deed or instrument, then you are charged that said deed will convey the interest of said Tomasa de la Pena in said land and no more, unless ratified by the other heirs of Valentin de los Fuentes. But if, on the contrary, you believe from all the evidence in the case that Agapito Martinez did not execute and deliver said deed, and that said deed is as to him a forgery, then you are charged that said deed is a nullity and conveys nothing, and is no muniment of title. You are charged also, that if you find that said deed is genuine, and that Agapito Martinez executed and delivered the same, then the said deed is an ancient instrument, and that a power of attorney from Tomasa de la Pena to· Agapito Martinez may be presumed if the evidence does not contradict such a presumption; but that no such presumption can be found if the evidence satisfies you that no such power of attorney ever existed." This charge can certainly not be rightfully complained of by the appellants. The only vice in it is, that it charges the power of attorney may be presumed. This is on the weight of evidence, and is in appellants' favor. Stooksbury v. Swan, 85 Texas, 563.

We do not think appellants showed such possession, using, or enjoyment of the land and payment of taxes thereon under deed or deeds

duly recorded as would entitle them to defeat the appellees' action by the five years' statute of limitations. The evidence is very strong that the deed of Agapito Martinez is a forgery, which issue was fully and properly submitted to the jury, who must have found it a forgery; and appellants deraign their title through this deed. The will of Callaghan, under whom defendants claim and held possession of the land, was never recorded.

It is not contended by appellants that the evidence was sufficient to defeat appellees' title under the ten years' statute of limitation.

There are other assignments of error, but the questions raised by them are all involved in the assignments considered, and decided adversely to appellants.

There is no error in the records requiring a reversal of the judgment rendered by the court below, and it is affirmed.

*Affirmed.*

Delivered April 11, 1894.

Motion for rehearing overruled.

Application for writ of error refused, October 15, 1894.